IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANNIA

| | |
|---|---|
| COASTAL FOREST RESOURCES COMPANY *a Virginia Corporation doing business as* COASTAL TIMBERLANDS COMPANY *formerly known as* COASTAL LUMBER COMPANY, <br><br> *Plaintiff,* <br><br> v. <br><br> CHEVRON U.S.A., INC., *et al.,* <br><br> *Defendants.* | Civil Action No. 2:20-cv-1119 <br><br> Hon. William S. Stickman IV |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff, Coastal Forest Resources Company ("Coastal Forest"), asserts claims for breach of contract and accounting against Defendants, Chevron U.S.A., Inc. ("Chevron U.S.A."), Chevron Appalachia, L.L.C. ("Chevron Appalachia"), and Atlas America, L.L.C. ("Atlas America"), contending that their use of the net-back method to recover post-production costs violated the terms of their lease. (ECF No. 1). Defendants filed a Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) (ECF No. 17), arguing that Coastal Forest's claims fail as a matter of law because the lease's language governing royalties incorporates the "at the wellhead" term that the Pennsylvania Supreme Court has held permits the recovery of the costs in question. (ECF No. 17, p. 1). The disposition of this case revolves around whether the Pennsylvania Supreme Court's interpretation of the term "at the wellhead" in *Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147 (Pa. 2010), should be given broad construction, covering all

instances where the term is used, or whether the decision was narrowly focused on whether leases using that term run afoul of the Guaranteed Minimum Royalty Act ("GMRA"), 58 P.S. § 33, *repealed by* Oil and Gas Lease Act, 58 P.S. § 33.3 (2013).[1] For the reasons expressed below, the Court holds that the *Kilmer* decision must be read broadly. As such, Costal Forest cannot prevail on its breach of contract and accounting claims and Defendants' Motion to Dismiss (ECF No. 17) will be granted.

## I.   BACKGROUND

Coastal Forest is the owner of a mineral estate of approximately 356.4 acres located in Greene Township, Greene County, Pennsylvania. (ECF No. 1, ¶ 1). Chevron U.S.A., Chevron Appalachia and Atlas America are oil and gas operators and producers that operate, drill, transport and produce hydrocarbons in and throughout Greene County, Pennsylvania. (ECF No. 1, ¶¶ 2–4).

On November 21, 2007, Coastal Forest leased the mineral estate to Atlas America (Lessee) and gave Atlas America the duty to market hydrocarbon production. (ECF No. 1, ¶¶ 8–9). The lease agreement provided, in relation to royalty payments for gas and hydrocarbon production, that Coastal Forest (Lessor) would be paid a production royalty as follows:

> Oil: To pay Lessor, as royalty for all oil and the constituents thereof, produced and saved from any well or wells drilled on the leased premises, an amount equal to five-thirty-seconds (5/32) or 15.625% of the price received by Lessee from the

---

[1] Although the statutory minimum royalty provision is now located in the Oil and Gas Lease Act, the language from the GMRA is substantially identical to the Oil and Gas Lease Act. The provision under the GMRA was "[a] lease or other such agreement conveying the right to remove or recover oil, natural gas or gas of any other designation from lessor to lessee shall not be valid if such lease does not guarantee the lessor at least one-eighth royalty of all oil, natural gas or gas of other designations removed or recovered from the subject real property." 58 P.S. § 33 (repealed 2013). The provision under the Oil and Gas Lease Act is "[a] lease or other . . . agreement conveying the right to remove or recover oil, natural gas or gas of any other designation from *the* lessor to *the* lessee shall not be valid if *the* lease does not guarantee the lessor at least one-eighth royalty of all oil, natural gas or gas of other designations removed or recovered from the subject real property." 58 P.S. § 33.3 (emphasis added).

2

> gross sale of such oil in the tanks, pipelines or other facilities, to which the Lessee may connect its wells.
>
> Gas: To pay Lessor as royalty for all gas and the constituents thereof, including all liquid, solid or gaseous substances produced and saved from any sand or sands on the leases premises, an amount equal to five-thirty-seconds (5/32) or 15.625% of the gross sales price received by Lessee from the sale of such gas and the constituents thereof ***at the wellhead***.

(ECF No. 1, ¶ 10); (ECF No. 1-2, p. 4) (emphasis added). On or about April 20, 2011, the Lease Agreement was vested in Chevron Appalachia when a certification of Amendment was filed with the Pennsylvania Department of State making Chevron Appalachia the Lessee under the Lease Agreement. (ECF No. 1, ¶ 11). Prior to this transaction, Atlas America assigned a portion of the mineral leasehold at issue to Reliance Marcellus LLC. (ECF No. 1, ¶ 12).[2]

Eight wells operated by Defendants actively produce gas in marketable quantities. (ECF No. 1, ¶¶ 15–16). Coastal Forest alleges that Defendants are taking unauthorized deductions from the gross sales price for post-production costs by using the net-back method. The net-back method allows deductions for certain post-production expenses associated with bringing the oil or gas to the market from the royalty paid to the lessor. It further alleges that these deductions are inconsistent with the plain language of the Lease Agreement. (ECF No. 1, ¶ 20). Specifically, Coastal Forest contends that Defendants unilaterally deducted $53,834.28 for "cost/other adj" from Coastal Forest's interest in the mineral estate, which was $266,195.99. (ECF No. 1, ¶ 21). When Coastal Forest asked what "cost/other adj" meant, Defendants stated that the deductions were for post-production costs. (ECF No. 1, ¶¶ 22–23). Coastal Forest alleges that it asked Defendants for

---

[2] Under the assignment with Reliance Marcellus, and its successor, Diversified Production LLC, Coastal Forest historically received royalty payments that did not deduct any post-production costs/expenses. (ECF No. 1, ¶¶ 13–14). Although neither Reliance Marcellus nor Diversified Production are parties to this case, this point is relevant because Coastal Forest attempts to use these third parties' performance as indicative of a breach on the part of Defendants.

3

further details on the post-production costs and the calculations for royalties owed to Coastal Forest from production of marketable gas from the wells. (ECF No. 1, ¶¶ 24–25). Defendants did not respond to the request for production and well information/data. (ECF No. 1, ¶ 26).

Coastal Forest claims that Defendants have breached their contract by taking deductions for post-production costs and by failing to make proper payments for the production of gas from the mineral estate. (ECF No.1, ¶¶ 27–28). They have sought redress through their claim of breach of contract (Count I) and a request for accounting (Count II).

## II. STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Although this Court must accept the allegations in the Complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement, but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is

present when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts give rise to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

Generally, a court may not consider an extraneous document when reviewing a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). If matters outside the pleadings are presented to, and not excluded by, the court, the motion must be converted to a motion for summary judgment. FED. R. CIV. P. 12(d). When reviewing the sufficiency of a complaint, however, a court may consider attachments to it without converting the motion into one for summary judgment as long as they are integral to the allegations in the complaint and are indisputably authentic. *Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 877 F.3d 487, 493 (3d Cir. 2017).

### III. ANALYSIS

The Court holds that Coastal Forest has failed to plead a plausible claim for breach of contract. Moreover, because there is no breach of contract, accounting cannot be awarded as a remedy. As such, the Motion to Dismiss will be granted in favor of Defendants.

#### A. BREACH OF CONTRACT – COUNT I

Coastal Forest's breach of contract claim hinges on whether the Pennsylvania Supreme Court's decision in *Kilmer* can be read as providing an industry wide interpretation of the term "at the wellhead" as permitting the use of the net-back method to recoup post-production expenses, or whether it is limited to the context of whether the method violates the GMRA. The Court holds

that application of the net-back method to "at the wellhead" language must have broad application to all leases using that terminology.

Under the net-back method, royalties are paid subject to the right of the operator to recoup its post-production expenses. To do so, they are calculated as "one-eighth of the sale price of the gas minus one-eighth of the post-production costs of bringing the gas to the market." *Kilmer*, 990 A.2d at 1149 (footnote omitted). In *Kilmer*, the Pennsylvania Supreme Court exercised its extraordinary jurisdiction[3] to resolve whether the net-back method of royalty calculation for oil and gas leases violated the GMRA. *Kilmer*, 990 A.2d at 1151. When the Pennsylvania Supreme Court chose to address this issue, there were a multitude of suits pending in Pennsylvania state courts alleging that the net-back calculation violated the statute. *Id.* In *Kilmer*, landowners filed a complaint for declaratory judgment seeking to invalidate their oil and gas lease because the lease allegedly violated the one-eighth royalty requirement of the GMRA. *Id.* The landowners argued that the deduction of post-production costs from their royalties left them with, in practical effect, less than a one-eighth share of the proceeds from the sale of oil and gas, in violation of the GMRA. *Id.* at 1151–52.

The Pennsylvania Supreme Court began its analysis by examining the plain language of the statute, (the touchstone of statutory interpretation, under 1 Pa. C.S. § 1921(b)), and noted that the GMRA does not use any language regarding post-production costs because at the time when

---

[3] "Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or magisterial district judge of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done." 42 Pa. C.S. § 726. For a comprehensive exploration of the Pennsylvania Supreme Court's Extraordinary and related King's Bench jurisdiction, see William S. Stickman IV, *The King's Bench Powers*, in THE SUPREME COURT OF PENNSYLVANIA: LIFE AND LAW IN THE COMMONWEALTH, 1684–2017, 26–39 (John J. Hare ed., 2018).

the GMRA was enacted, virtually all royalties "were based on the sale of unprocessed gas from the producer to the pipeline companies *at the wellhead.*" *Id.* at 1157 (emphasis added). With no specific statutory language addressing the net-back method, the Pennsylvania Supreme Court looked to the widely held and generally accepted industry-specific use of the term "at the wellhead." It observed that although words can be defined by their dictionary definition, "technical words and phrases and such others as have acquired a peculiar and appropriate meaning . . . shall be construed according to such peculiar and appropriate meaning or definition." *Id.* (quoting 1 Pa. C.S. § 1903) (internal quotation marks omitted). Thus, the Pennsylvania Supreme Court looked to the usage of the oil and gas industries to determine the meaning that should be afforded to the "at the wellhead" language.

The Pennsylvania Supreme Court considered a variety of industry specific treatises that supported a broad treatment of "royalty": George A. Bibikos & Jeffrey C. King, *A Primer on Oil and Gas Law in the Marcellus Shale States*, 4 TEX. J. OIL, GAS, & ENERGY L. 155, 168–69 (2009) (explaining post-production costs and noting that a majority of jurisdictions authorize the deduction of post-production costs in the calculation of royalties); PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS, MANUAL OF OIL AND GAS TERMS § R (14th ed. 2009) ("Although the royalty is not subject to costs of production, usually it is subject to costs incurred after production, e.g., production or gathering taxes, costs of treatment of the product to render it marketable, costs of transportation to market."); 17 WILLISTON ON CONTRACTS § 50:60 (4th ed. 2009) ("While a lease may make the amount of the royalty dependent on the proceeds, generally the royalty is not payable from gross profit but from the net amount remaining after deduction of certain production and development costs."). *Id.* at 1157–58. Ultimately, having thoroughly reviewed the industry-specific authorities addressing the net-back method of calculating royalties,

the Pennsylvania Supreme Court concluded that "the GMRA should be read to permit the calculation of royalties at the wellhead, as provided by the net-back method . . . ." *Id.* at 1158.

Coastal Forest argues that *Kilmer* was not meant to provide an expansive definition that would allow the net-back method to be used in all instances where the "at the wellhead" language is present, but rather, that it was a case of narrow statutory interpretation limited to the construction of the GMRA. Coastal Forest relies heavily upon *Marburger v. XTO Energy, Inc.*, No. 15-910, 2016 WL 11659184 (W.D. Pa. Jan. 26, 2016). In *Marburger*, parties brought suit for alleged wrongful deductions of post-production costs from oil and gas royalties. *Id.* at *1. The defendant moved to dismiss the action, arguing that *Kilmer* specifically permitted the use of the net-back method. *Id.* at *3 (quoting *Kilmer*, 990 A.2d at 1157) ("XTO responds that the term 'royalty' in the oil and gas industry has been defined by the Pennsylvania Supreme Court as '[t]he landowner's share of production, free of the expenses of production.'"). In adjudicating the motion, the district court noted that, "XTO argues that the Pennsylvania Supreme Court's adoption of the net-back method of calculating oil and gas royalties should be applied to the leases here, as they are silent as to the term 'royalty' and such definition is consistent with industry standard." *Id.* It denied XTO's motion to dismiss, and in so doing pointed out that *Kilmer* was a statutory construction case and not a contract interpretation case. *Id.* at *5. It explained that *Kilmer* held that, "the GMRA should be read <u>to permit</u> the calculation of royalties at the wellhead, as provided by the net-back method in the [l]ease[.]" *Id.* at *4 (quoting *Kilmer*, 990 A.2d at 1158) (internal quotation marks omitted) (emphasis added). Ultimately, the district court in *Marburger* made clear that *Kilmer* does not mandate that royalties be calculated under the net-back method.

Costal Forest's reliance on *Marburger* is misplaced because it is distinguishable from this case on a critical point. The royalty language at issue in *Marburger* made no mention of the term "at the wellhead." It simply stated:

> **ROYALTY.** IN CONSIDERATION of the above demise…
>
> Should any well not produce oil, but produce gas (except storage gas) and the gas produced therefrom be sold off the said premises, the consideration to said lessor for the gas from each well completed and from which well gas is produced, metered and sold shall be as follows:
>
> **Royalty equal to one-eighth (1/8) of the proceeds received from time to time by lessee for all gas (except storage gas) produced, metered and sold, less lessor's pro rata share of any severance or excise tax imposed by any government body.** Payment of said royalty shall be made on or about the 25th day of the month for all gas produced, metered and sold during the preceding month. The time and method of producing, metering, delivering and selling the gas produced from any well on the leased premises and the amount thereof that shall be used or sold within any period of time shall be entirely within the sole discretion of the lessee.

*Marburger*, at *1. *Marburger* merely held that there is nothing in *Kilmer* that *requires* parties to a gas lease to use the net-back method in calculating royalties. *Kilmer* cannot be read so narrowly as to ignore the fact that it interpreted "at the wellhead" language in leases as providing for the use of the net-back method. Where that language is present (unlike in *Marburger*) it must, consistent with *Kilmer*, be read as calling for the use of the net-back method of calculating royalties. Costal Forest finds no solace, therefore, in *Marburger*.

Further, cases following *Kilmer* interpreted the Pennsylvania Supreme Court's holding broadly—even more broadly than *Marburger*. In *Ulmer v. Chesapeake Appalachia, LLC*, No. 4:08-cv-2062, 2011 WL 1344596 (M.D. Pa Apr. 8, 2011), the district court rejected the plaintiffs' contention that *Kilmer*'s holding was limited to leases with the same language as those before the Pennsylvania Supreme Court. It explained that, "it is our view that *Kilmer* is properly read broadly in light of the fact that the Pennsylvania Supreme Court granted extraordinary jurisdiction to

9

resolve the purely legal question of whether post-production costs are proper under Pennsylvania oil and gas law." *Id.* at *2. Thus, "[a]pplying common sense to the matter, it is evident that the Pennsylvania Supreme Court surely considered that all of the leases that would be affected by their decision were not identical, thus their holding cannot be strictly applied only to leases that are on all fours to the lease in *Kilmer*." *Id.* Therefore, the district court held that, "it is clear after *Kilmer* that the GMRA permits the calculation of royalties at the wellhead utilizing the net-back method . . . ." *Id.* at *3.

In *Aker v. Keeton Grp., LLC*, No. 3:2009-101, 2011 WL 13235036 (W.D. Pa. Mar. 15, 2011), the district court provided an even broader interpretation of *Kilmer*. It unequivocally interpreted *Kilmer* to require the use of the net-back method, and explained, "[t]hough the essence of Plaintiff's argument is that *Kilmer's* holding should be narrowly applied, it is our view that *Kilmer* is properly read broadly in light of the fact that the Pennsylvania Supreme Court granted extraordinary jurisdiction to resolve the purely legal question of whether post-production costs are proper under Pennsylvania oil and gas law." *Id.* at *5. The district court also stated: "***[i]n Kilmer the Pennsylvania Supreme Court expressly adopted an 'at the wellhead' definition of royalty and expressly adopted the 'netback' method for determining that royalty.***" *Id.* (emphasis added). Thus, the district court in *Aker* interpreted *Kilmer* as grafting the net-back method into the definition of "royalty" in the oil and gas context. In other words, *Aker* can be interpreted as supporting the concept that even without the talismanic "at the wellhead" language, the net-back method is, nevertheless, required because *Kilmer* defined "royalty" itself from an "at the wellhead," and thus, "net-back" foundation.

In undertaking its own interpretation of *Kilmer,* this Court holds that it should be construed broadly and critically, read through the prism that the Pennsylvania Supreme Court used in

10

interpreting the "at the wellhead" language. As the Pennsylvania Supreme Court reasoned, one of the fundamental methods for statutory interpretation is to examine the industry accepted definition. *See* 1 Pa. C.S. § 1903 ("[T]echnical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition."). The Pennsylvania Supreme Court could not rely upon a GMRA-specific definition of "at the wellhead" or "net-back method" because there was none. Lacking a statute-specific definition of those terms, it took a broader view as to how they are treated in the oil and gas industry. In doing so, it examined several treatises that stand for the proposition that leases using the "at the wellhead" terminology permit the use of the net-back method to recover post-production expenses. The Court applied this industry-accepted usage to the specific issue of whether the net-back method violated the GMRA. It did not, and in light of its interpretative methodology, could not limit its interpretation of the "at the wellhead" language to the confines of the GMRA. Rather, it applied the interpretation of the contractual language that was already well established in the oil and gas industry.

For industry-specific guidance, the Pennsylvania Supreme Court looked to the WILLIAMS & MEYERS, MANUAL OF OIL AND GAS TERMS included with WILLIAMS & MEYERS, OIL AND GAS LAW. *Kilmer*, 990 A.2d at 1157. Its reliance on these authorities was sound in that they are "arguably the foremost authoritative treatises on the law relating to oil and gas[]" and are frequently cited by courts in interpreting industry-specific terms. *Smith v. Steckman Ridge, LP*, 590 F. App'x. 189, 194 n.5 (3d Cir. 2014). *See also Cotton v. Petroleum Corp. v. New Mexico*, 490 U.S. 163, 208 (1989) (Blackmun, J., dissenting) (relying on Williams & Meyers for the meaning of an infill well); *C.I.R. v. Engle*, 464 U.S. 206, 209 n.4 (1984) (relying on Williams & Meyers for the meaning of a lease bonus payment). The Court's review of those industry

authorities only highlights the fact that the Pennsylvania Supreme Court's determination was broad and should be afforded broad application whenever the term "at the wellhead" is used. As the most recent edition of the WILLIAMS & MEYERS, MANUAL OF OIL AND GAS TERMS notes: "the term 'wellhead' is very precise and definite because it is a clearly recognizable place which even laypersons can understand." 3 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS, MANUAL OF OIL AND GAS TERMS § 645.2 (17th ed. 2018). "At the wellhead" language is used to indicate "that any downstream costs incurred by the operator from the well to the place where the leased product is disposed of in an arm's length transaction are borne pro rata by owners of operating and owners of nonoperating interests." *Id.* at § A.

The contract here unquestionably calls for the calculation of royalties "at the wellhead." (ECF No. 1 ¶ 10); (ECF No. 1-2). Under *Kilmer*, "at the wellhead" language means that the net-back method may be used for calculation. This is the only conclusion consistent with Pennsylvania law and industry custom. Indeed, at oral argument, Coastal Forest conceded that it could cite no cases where "at the wellhead" is used and has been found to mean *anything other* than permitting the net-back method.[4] (ECF No. 25, p. 22). The lease provisions in this case expressly and unequivocally call for the calculation of royalties "at the wellhead." Therefore, the contract must be interpreted as permitting the net-back method.[5]

---

[4] Q: "Do you cite any cases where at the wellhead is used for anything other than net-back method, where it says at the wellhead and it means something that's not net-back?"
A: "I don't believe we do." (ECF No. 25, p. 22).

[5] As an aside, Coastal Forest argues that because Reliance Marcellus and its successor, Diversified Production, LLC, while governed by the same lease language, do not deduct post-production expenses, it indicates that the net-back method is not appropriate. The choice of those companies does not establish an authoritative definition of the lease terminology. They are free to pay more than they are obligated under the royalty provision of the lease. Although one company has been benevolent in its deductions, it does not follow that another company must also do so. Coastal Forest is entitled to deduct for "costs incurred after production, e.g., production or gathering taxes,

Coastal Forest's claim—that Defendants breached the contract by using the net-back method to deduct post-production costs—cannot stand as a matter of law. Count I will be dismissed.

### B. ACCOUNTING – COUNT 2

A cause of action for legal accounting exists where:

1) there was a valid contract, express or implied, between the parties whereby the defendant

   (a) received monies as agent, trustee or in any other capacity whereby the relationship created by the contract imposed a legal obligation upon the defendant to account to the plaintiff for the monies received by the defendant, or

   (b) if the relationship created by the contract between the plaintiff and defendant created a legal duty upon the defendant to account and the defendant failed to account and the plaintiff is unable, by reason of the defendant's failure to account, to state the exact amount due him, and

2) that the defendant *breached* or was in dereliction of his duty under the contract.

*Haft v. U.S. Steel Corp.*, 499 A.2d 676, 677–78 (Pa. Super. 1985) (emphasis added). As explained above, Defendants had the right to deduct post-production costs under the net-back method. They were not in breach of the contract and conducted themselves properly as a matter of law. Moreover, Coastal Forest conceded at oral argument that its accounting claim cannot stand without a breach of contract.[6] (ECF No. 25, pp. 23–24). Because there is no surviving breach of contract claim, the legal accounting claim (Count II) will also be dismissed.

---

costs of treatment of the product to render it marketable, costs of transportation to market." *Kilmer*, 990 A.2d at 1157 (quoting MANUAL OF OIL AND GAS TERMS § R).

[6] Q: Is it possible for me to dismiss the contract claim yet maintain the legal—the accounting claim? Or is the contract a necessary element of legal accounting?
A: I believe the contract is a necessary element of the legal accounting because the contract is the genesis under paragraph 13 of the accounting claim.
Q: Either both stand or both fall; you can't have one or the other?
A: Well, if one fell, say the royalty claim fell, we'd have to—it would just be a nature of contract claim, but I think that the two here should be tied together . . . . (ECF No. 25, pp. 23–24).

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF No. 17) will be granted and Coastal Forest's claims will be dismissed with prejudice. An Order of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

May 10, 2021
Dated